STATE of Wisconsin EX REL. Richard W. ZIERVOGEL and Maureen A. McGinnity, Plaintiffs-Appellants,†

v.

WASHINGTON COUNTY BOARD OF ADJUSTMENT, Defendant-Respondent,

STATE of Wisconsin, Intervenor-Respondent.

Court of Appeals

*No. 02–1618. Submitted on briefs January 9, 2003.—Decided March 26, 2003.*

2003 WI App 82

(Also reported in 661 N.W.2d 884.)

† Petition to review granted 6-12-03.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Maureen A. McGinnity* of *Foley & Lardner*, Milwaukee.

On behalf of the defendant-respondent, the cause was submitted on the brief of Office of Corporation Counsel *Kimberly A. Nass*, by *Christine E. Ohlis*, assistant corporation counsel.

On behalf of the intervenor-respondent, the cause was submitted on the brief of *Philip Peterson*, assistant attorney general, and *James E. Doyle*, attorney general.

Before Brown, Anderson and Snyder, JJ.

¶ 1. SNYDER, J. Richard W. Ziervogel and Maureen A. McGinnity appeal from an order of the circuit court denying their petition for certiorari review of the Washington County Board of Adjustment's denial of their request for a zoning variance. Ziervogel and McGinnity argue that the Board ignored the standards set forth in *State v. Outagamie County Board of Adjustment*, 2001 WI 78, 244 Wis. 2d 613, 628 N.W.2d 376, and *State v. Kenosha County Board of Adjustment*, 218 Wis. 2d 396, 577 N.W.2d 813 (1998), and proceeded on an incorrect theory of law and that its decision was arbitrary and unreasonable. We disagree and conclude that the Board applied the proper standard of review in denying Ziervogel and McGinnity's request for a variance. We therefore affirm the order of the circuit court.

## FACTS

¶ 2. Ziervogel and McGinnity own a house on a 1.4 acre lot with approximately 200 feet of shore frontage on Big Cedar Lake in Washington county. While they originally purchased the home as a summer home, they now wish to move there year-round and propose construction of a 10–foot vertical expansion to add bedroom, bathroom and office space. It is questionable whether this is a second- or third-floor addition to the house.

¶ 3. The house has a legally nonconforming setback of 26 feet from the ordinary high watermark and Ziervogel and McGinnity claim that notwithstanding

the size of the lot, the house is located on the only area suitable for building. At the time Ziervogel and McGinnity purchased the property, the property conformed to all zoning ordinances. However, in June 2001, Washington county amended the relevant ordinance, § 23.13(3)(d) of the Shoreland, Wetland and Floodplain Zoning section of the Washington County Code, to prohibit any expansion of any portion of an existing structure within 50 feet of the ordinary high watermark. Ziervogel and McGinnity's entire home is within 50 feet of the ordinary high watermark.

¶ 4. Around the beginning of September 2001, Ziervogel and McGinnity applied to the Washington county zoning administrator for a permit to construct their proposed addition. The zoning administrator denied the permit based on § 23.13(3)(d).

¶ 5. After a denial of this permit application, Ziervogel and McGinnity applied to the Board for a variance, in addition to a zoning permit to the Washington County Planning and Parks Department. The Board met on October 22, 2001, and conducted a public hearing on Ziervogel and McGinnity's request for a variance to build the addition to the home. At the hearing, a letter from the Department of Natural Resources recommending the Board deny the variance request was submitted and read into the record.

¶ 6. The Planning and Parks Department did not disagree with the DNR. The assistant administrator of the Planning and Parks Department, Herb Wolf, discussed the adoption of the Washington county shoreland ordinance, which became effective June 1, 2001. Wolf read into the record the definition of "unnecessary hardship" as defined in the Washington County Code.

¶ 7. Ziervogel and McGinnity argued before the Board that their requested variance would not impair

the public's interest; the proposed addition would not expand their legally nonconforming use because the proposed addition was a strictly vertical expansion. Ziervogel and McGinnity further argued that the expansion would not affect anyone else's enjoyment of the lake, the neighbors on both sides did not object and there was adequate existing tree cover to block the view of the proposed addition from the lake.

¶ 8. The Board unanimously voted to deny Ziervogel and McGinnity's variance request, concluding that denial of the variance "would not make [the] property useless." Ziervogel and McGinnity filed an action for certiorari review of the Board's decision. The circuit court upheld the Board's decision. Ziervogel and McGinnity appeal.

## DISCUSSION

■

¶ 9. On certiorari review, we limit our review to (1) whether the Board kept within its jurisdiction; (2) whether it proceeded on a correct theory of law; (3) whether its action was arbitrary, oppressive or unreasonable and represented its will and not its judgment; and (4) whether the Board might reasonably make the order or determination in question, based on the evidence. *Kenosha County*, 218 Wis. 2d at 410–11. In this case, Ziervogel and McGinnity's challenge focuses on the last three criteria.

¶ 10. Ziervogel and McGinnity's basic argument is that both *Kenosha County* and *Outagamie County* require a test to determine if the variance should be granted and that the Board failed to utilize this test. Ziervogel and McGinnity first argue that both *Kenosha County* and *Outagamie County* require a balancing test,

balancing the public interest and the purpose of the zoning ordinance against the rights of the property owner. However, Ziervogel and McGinnity also argue that *Kenosha County* and *Outagamie County* both set forth a two-part test: (1) whether the proposed variance violates the purpose of the zoning ordinance at issue and (2) a determination of whether the property owners have any reasonable use of the property if the variance is denied (i.e., the "no reasonable use" standard). Ziervogel and McGinnity argue that it is only after a determination that the requested variance is in conflict with the public interest that the "no reasonable use" standard applies; in other words, if the Board were to determine that the requested variance is not in conflict with the public interest, then the Board need not reach the "no reasonable use" step. We disagree that either of the two tests advanced by Ziervogel and McGinnity has been established by case law.

¶ 11. We must first address Ziervogel and McGinnity's extensive reliance on *Outagamie County*. Only a small portion of *Outagamie County* is of any precedential value and the portion with precedential value in no way overruled or invalidated the provisions of *Kenosha County*. As Ziervogel and McGinnity correctly note in their brief, the *Outagamie County* court issued multiple decisions. The lead opinion was authored by Justice Sykes, joined in the opinion's entirety by Justices Bablitch and Prosser. *Outagamie County*, 2001 WI 78 at ¶¶ 1, 5 n.1. These three justices voted to overrule *Kenosha County*. *Outagamie County*, 2001 WI 78 at ¶ 5.

¶ 12. However, in a concurring opinion, Justices Crooks and Wilcox disagreed it was necessary to overrule *Kenosha County* and deferred to the principle of *stare decisis. Outagamie County*, 2001 WI 78 at ¶ 5

327

nn.2 & 3, ¶ 71. Justices Crooks and Wilcox joined only in sections IV and V of the lead opinion. *Outagamie County*, 2001 WI 78, ¶ 5 nn.2 & 3. Justices Abrahamson and Bradley dissented. *Id.* at ¶¶ 119–150.

¶ 13. Although *Outagamie County* may contain relevant discussions, only majority opinions of the court have any precedential value. *See Doe v. Archdiocese of Milwaukee*, 211 Wis. 2d 312, 334 n.11, 565 N.W.2d 94 (1997). Thus, in *Outagamie County*, the only portions that have any precedential value are sections IV and V, neither of which addresses the issue before us.[1] We conclude that our analysis is governed by the standards set forth in *Kenosha County*.

¶ 14. Wisconsin has a long history of protecting its water resources, its lakes, rivers and streams, which depend on wetlands for their proper survival. *Kenosha County*, 218 Wis. 2d at 406. To ensure this protection, the legislature has authorized the DNR to develop water conservation standards and to disseminate these general recommended standards and criteria to local municipalities. *Id.* The purpose of state shoreland zoning standards is to further the maintenance of safe and healthful conditions; prevent and control water pollution; protect spawning grounds, fish and aquatic life; control building sites, placement of structure and land

---

[1] Section IV addressed whether Wis. Admin. Code § NR 116.13 forecloses the issuance of a variance in that case and section V addressed whether the issuance of the variance was consistent with the procedures and standards of the Outagamie County Shoreland/Floodplain/Wetland Zoning Ordinances. *State v. Outagamie County Bd. of Adjustment*, 2001 WI 78, ¶¶ 54–67, 244 Wis. 2d 613, 628 N.W.2d 376. Thus, *Outagamie County* is of no precedential value to us here.

uses; and reserve shore cover and natural beauty. *Id.* The basic purpose of a shoreland zoning ordinance is to protect navigable waters and the public rights therein from the degradation and deterioration which result from uncontrolled use and development of shorelands. *Id.*

¶ 15. The State, through an enabling statute, WIS. STAT. § 59.694(7) (1999–2000),[2] has given county boards of adjustment the power to grant exceptions to zoning regulations known as "variances." The boards are empowered

> [t]o authorize upon appeal in specific cases variances from the terms of the ordinance that will not be contrary to the public interest, where, owing to special conditions, a literal enforcement of the provisions of the ordinance will result in unnecessary hardship, and so that the spirit of the ordinance shall be observed and substantial justice done.

Sec. 59.694(7)(c); *see also Kenosha County*, 218 Wis. 2d at 406–07.

¶ 16. Washington county has authorized the use of that state-granted power by its Board of Adjustment through the portion of the Washington County Code addressing Shoreland, Wetland and Floodplain Zoning, which reads, in part:

> Uncontrolled use of the shorelands, damage to wetlands, and uncontrolled development and use of the floodplains, lakes, ponds, flowages, rivers or streams of Washington County and pollution of the navigable waters and all land within the shorelands, wetlands and floodplains of Washington County would adversely affect the public health, safety, convenience, and gen-

---

[2] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

eral welfare and impair its tax base. The Legislature of Wisconsin has delegated responsibility to the Counties to further the maintenance of safe and healthful conditions; prevent and control water pollution; protect spawning grounds, fish and aquatic life; control placement of structures and land uses; to preserve shore cover and natural beauty; and to provide sound floodplain management and regulations for all floodplains within unincorporated areas of the County. This responsibility is hereby acknowledged by Washington County, Wisconsin.

Washington County Code § 23.01(2). These ordinances were established "[f]or the purpose of promoting the public health, safety, convenience, welfare and to provide a uniform basis for the preparation, implementation and administration of sound shoreland, wetland, and floodplain regulations for all unincorporated areas of the County . . . ." Washington County Code § 23.01(3).

¶ 17. The Washington County Code sets out more fully several standards and guidelines for the Board to consider in determining whether to grant a variance:

Any deviation from the standards of this chapter, for which a County permit has been denied by the administrator, may be allowed only upon written request for a variance submitted to the administrator, after a public hearing and the issuance of a variance by the County Board of Adjustment. *The Board may authorize in specific cases such variance from the terms of the chapter as will not be contrary to the public interest where,* owing to special conditions affecting a particular property, *a literal enforcement of the provisions of this chapter would result in unnecessary hardship as defined in sub. 23.18(77).* A variance shall:

1. Be consistent with the spirit and purpose of this chapter as stated in sub. 23.01(3).

2. Not permit a lower degree of flood protection in the floodway area than the flood protection elevation, as defined in sub. 23.18(32). In the floodfringe area, a lower degree of flood protection than the flood protection elevation may only be allowed pursuant to sub. 23.13(5)(b).

3. Not be granted because of conditions that are common to a group of adjacent lots or premises. (In such a case, the zoning ordinance would have to be amended following proper procedures.)

4. Not be granted unless it is shown that the variance will not be contrary to the public interest and will not be damaging to the right of other persons or property values in the area.

5. Not be granted for actions which require an amendment to this chapter or the map(s) described in sub. 23.02(4).

6. Not have the effect of granting or increasing a use of property which is prohibited in a particular zoning district.

7. Not be granted solely on the basis of economic gain or loss.

8. Not be granted for a self-created hardship.

9. Be consistent with soil and water conservation practices when no reasonable alternative exists. An example would be an animal waste control project where existing structures are already nonconforming.

10. Not allow any alteration of an historic structure, including its use, which would preclude its continued designation as an historic structure.

Washington County Code § 23.15(6)(e) (emphasis added).

¶ 18. The language used in the county ordinance setting forth the conditions under which variances may be granted is virtually identical to the language used in the statute providing for variances. Both the statute and the ordinance specify that a variance may be granted only where it is not "contrary to the public interest." Wis. Stat. § 59.694(7)(c); Washington County Code § 23.15(6)(e). The legislature has defined the public's interest in restricting shoreland development as several interests, including maintaining health and safety, minimizing pollution, sustaining aquatic life and preserving natural beauty. *Kenosha County*, 218 Wis. 2d at 407–08.

¶ 19. In addition, both the statute and the Washington county ordinance specify that the variance applicant must demonstrate "special conditions" to justify granting the variance and both specify that a variance applicant must demonstrate "unnecessary hardship" to justify receiving the variance. However, only the Washington County Code defines the latter term:

> Any unique and extreme inability to conform to the provisions of this chapter due to special conditions affecting a particular property which were not self-created and are not solely related to economic gain or loss. *Unnecessary hardship is present* **only** *where, in the absence of a variance, no reasonable use can be made of the property.*

Washington County Code § 23.18(78) (emphasis added).

██

¶ 20. Again Ziervogel and McGinnity argue both that the Board should have conducted a balancing test, balancing the public interest and the purpose of the zoning ordinance against the rights of the property owner, and that the Board should have engaged in a

two-part test, first determining whether the proposed variance conflicts with the purpose of the zoning ordinance at issue and then determining whether the property owners have any reasonable use of the property if the variance is denied. Ziervogel and McGinnity misinterpret the holding of *Kenosha County*.

¶ 21. Nothing in *Kenosha County* supports the contention that the Board must first determine whether the requested variance conflicts with the public purposes behind the shoreland setback restrictions and if it does not, the Board need not reach the "no reasonable use" test. Such an interpretation conflicts with both the clear language in *Kenosha County* and in the Washington county ordinance that requires "no reasonable use" of the property as a precondition for obtaining a variance.

¶ 22. The *Kenosha County* court explicitly stated numerous times throughout the opinion that "[b]oth the statute and the ordinance specify that a variance applicant show 'unnecessary hardship' to justify receiving the variance." *Kenosha County*, 218 Wis. 2d at 409. The *Kenosha County* court unequivocally concluded that "unnecessary hardship requires that the property owner demonstrate that without the variance, he or she has no reasonable use of the property." *Id*. at 398.

██

¶ 23. While the purpose of the zoning ordinance should not be lost in the determination of whether to grant a variance, the proper test is whether a feasible use is possible without the variance. *Id*. at 413. When the record before the Board demonstrates that the property owner would have a reasonable use of his or her property without the variance, the variance request should be denied. *Id*. at 414.

¶ 24. The purposes of zoning laws demand that variances be granted sparingly and *Kenosha County* states that "[o]nly when the applicant has demonstrated that he or she will have no reasonable use of the property, in the absence of a variance, is an unnecessary hardship present." *Id*. at 421.

¶ 25. The unambiguous holding of *Kenosha County* does not require a balancing test or a two-part test; we cannot read *Kenosha County* any other way but to conclude that a successful variance applicant must prove that he or she has no reasonable use of the property without the requested variance. Subsequent case law has interpreted *Kenosha County* the same:

> *Kenosha County Board of Adjustment* instructs that an "unnecessary hardship" can be found only if the applicant has demonstrated that *no reasonable use* of the property exists without a variance. In other words, the burden is on the applicant to demonstrate through the evidence that without the variance he or she is prevented from enjoying any reasonable use of his or her property.

*State ex rel. Spinner v. Kenosha County Bd. of Adjustment*, 223 Wis. 2d 99, 107, 588 N.W.2d 662 (Ct. App. 1998) (citation omitted).

¶ 26. Assuming that *Kenosha County* established a balancing or two-part test, which we cannot, and that Ziervogel and McGinnity's request met the requirements of said test, their variance request would still fail pursuant to the terms of the Washington County Code. Washington County Code § 23.15(6)(e) specifically states, "The Board may authorize in specific cases such variance . . . as will not be contrary to the public interest where . . . a literal enforcement of the provisions of this chapter would result in unnecessary hardship as

defined in sub. 23.18(7[8])."[3] Washington County Code § 23.18(78) concludes that "unnecessary hardship" exists "only where, in the absence of a variance, no reasonable use can be made of the property."

■

¶ 27. The standards established by the State are only the reasonable minimum standards required by counties; counties in this state have broad authority to zone shoreland areas in a manner that is more restrictive than the minimum standards set forth by the DNR. *County of Adams v. Romeo*, 191 Wis. 2d 379, 384 n.1, 528 N.W.2d 418 (1995); *see also* WIS. ADMIN. CODE § NR 115.01(1).

■

¶ 28. The Washington County Code makes no provision for any balancing or two-part test; a variance applicant can only receive a variance where a denial of a variance. leads to no reasonable use of the property. Ziervogel and McGinnity have not met this burden.

## CONCLUSION

¶ 29. Contrary to Ziervogel and McGinnity's assertions, *Kenosha County* does not establish a balancing test or two-part test for determining whether to grant or deny a variance request. Both *Kenosha County* and the Washington County Code conclude that a successful variance applicant must prove that he or she has no reasonable use of the property without the requested variance. Ziervogel and McGinnity still have reasonable use of their property and the Board properly denied their request for a variance.

---

[3] Washington County Code § 23.15(6)(e) refers to § 23.18(77) for the definition of unnecessary hardship; however, unnecessary hardship is actually defined in § 23.18(78).

*By the Court.*—Order affirmed.

¶ 30. BROWN, J. (*concurring*). While I agree with the majority's conclusion that *State v. Kenosha County Board of Adjustment*, 218 Wis. 2d 396, 577 N.W.2d 813 (1998), *did not* establish a two-part test which boards of adjustment must use in deciding whether to grant or deny a request for a variance, I am convinced that *Snyder v. Waukesha County Zoning Board of Adjustment*, 74 Wis. 2d 468, 247 N.W.2d 98 (1976), *did* establish this test *in certain circumstances* and *Kenosha County* merely followed *Snyder*. Thus, I disagree with the majority's view that there is not a two-part test in Wisconsin. However, I am satisfied, from my reading of the record, that while the Washington County Board of Adjustment was required to use a two-part test under the circumstances that it had before it, it did so. For this reason, I ultimately concur with the result reached by the majority.

¶ 31. Justice N. Patrick Crooks nicely summed up the law in his concurring opinion in *State v. Outagamie County Board of Adjustment*, 2001 WI 78, ¶¶ 71–81, 244 Wis. 2d 613, 628 N.W.2d 376 (Crooks, J., concurring). Before *Snyder*, whether to use the "unnecessary hardship" standard or the less demanding "practical difficulties" test depended upon whether the landowner's request was for an area variance or a use variance. *Outagamie County*, 2001 WI 78 at ¶ 72 (Crooks, J., concurring). As Justice Crooks explained, area variances "apparently were granted based upon a showing of 'practical difficulties' which was 'something much less severe than unnecessary hardship.' Use variances, in contrast, were granted upon a showing of 'unnecessary hardship.' " *Id.*

336

¶ 32. As Justice Crooks clarified, the *Snyder* court considered the dichotomy to be unhelpful, especially in so far as shoreland zoning ordinances were concerned. *See Outagamie County,* 2001 WI 78 at ¶ 72 (Crooks, J., concurring). Instead, the *Snyder* court determined that the granting of a variance, whether it is an area variance or a use variance, should be dependent upon whether the requested variance is contrary to the purpose of the zoning ordinance. *Outagamie County,* 2001 WI 78 at ¶ 72 (Crooks, J., concurring).

¶ 33. Thus, a new paradigm was created. First, the zoning authority must decide whether the requested variance conflicts with the purpose of the statute. Whether it is an area variance or a use variance is only a factor in determining whether the request strikes at the purpose of the ordinance, nothing more. If the request strikes at the very purpose of the zoning ordinance, the landowner must then meet a very strict definition of the unnecessary hardship standard—that no reasonable use can be made of the property in the absence of a variance. The second part of the test is for the zoning adjustment board to apply this strict definition and determine whether the requester can make reasonable use of the property without the variance.

¶ 34. Conversely, if the request does not conflict with the purpose of the ordinance, then there is no reason why the request should not be granted and the requester need not jump through any further hoop. Thus, if the variance request is not at odds with the purpose of the ordinance, there is no second part of the test. The variance may be granted because, to not do so, would be to force an unnecessary restriction on a request that does not violate the spirit of the zoning ordinance.

¶ 35. As Justice Crooks explained:

337

*Kenosha County*, like *Snyder*, reiterated that "whether a particular hardship is unnecessary or unreasonable is judged against the purpose of the zoning law." Within this general parameter, county boards of adjustment have some very real flexibility in granting variances. The boards can determine, by looking to the purpose underlying the ordinance at issue, *what reasonably* constitutes an unnecessary hardship. Implicit in considering the variance request in relation to the ordinance's purpose is consideration of the nature of the restriction in the ordinance. That is, boards of adjustment should also consider whether the restriction involves, for example, "setbacks, frontage, height, bulk or density," or whatever restriction is at issue. Consideration of a variance request as it relates to the purpose of the zoning ordinance, along with review of the specific restriction at issue, must necessarily take into account the differences resulting from the granting of an area or use variance. Indeed, "because area variances do not involve great changes in the character of the neighborhoods as do use variances," the purpose of the zoning ordinance may not be so likely undermined by an area variance as it might be by a use variance.

*Outagamie County*, 2001 WI 78 at ¶ 74 (Crooks, J., concurring) (emphasis added).

¶ 36. I understand Justice Crooks to say that the job of the zoning board is to first determine the purpose of the ordinance. Then, the next step is to look at the variance request and see whether it violates the purpose. If it does, then the hardship in not granting the variance depends on whether the requester can show that he or she will have no reasonable use of the property without the variance. If the purpose is not violated, then it would be unreasonable to enforce the ordinance in that situation.

¶ 37.　Thus, even to decide whether the requester can make reasonable use of his or her property absent a variance will depend, first and foremost, on whether the request violates the purpose of the ordinance. If it does, the burden is on the landowner to prove no reasonable use. If it does not, then there is no such burden.

¶ 38.　For instance, a zoning ordinance may seek to regulate density in residential neighborhoods and a request for a one-foot variance to a front setback requirement might be granted because it does not increase density; therefore, it does not conflict with the purpose. Why then would the board need to impose a requirement that the landowner prove that no reasonable use of the land could be made without the granting of the variance? It would make no sense.

¶ 39.　On the other hand, suppose that the request is to encroach upon the lake in building an addition to a riparian home. The purpose of the shoreland zoning ordinance is to prevent encroachment for ecological and aesthetic reasons. Thus, the landowner should have to prove that, without the variance, no reasonable use of the property could be had. It is my belief that this is the law as set forth by *Snyder* and *Kenosha County* and as recounted by Justice Crooks in his concurrence.

¶ 40.　Justice Crooks' concurrence teaches that there is no reason to hold on to the artificial distinctions of "area variances" and "use variances" and of "unnecessary hardship" versus "practical difficulties." Justice Crooks related that, in *Kenosha County*, the court simply followed *Snyder*. And like *Snyder*, the *Kenosha County* court refused to be drawn into a battle over the artificial definitions of "area variances" and "use variances." *Outagamie County*, 2001 WI 78 at ¶ 73 (Crooks, J., concurring). Instead, the court looked to the purpose

339

of the shoreland zoning regulation at issue. *Id.* It then decided that because the purpose of the shoreland zoning ordinance was being invaded by the requested variance, the "no reasonable use" definition of unnecessary hardship should adhere. *Id.* The court then determined (the second part of the test) that since the landowner would still have reasonable use of her property, were the variance not granted, the request should fail. Thus, Justice Crooks' concurring opinion accurately states the law in Wisconsin—which is that there *is* a two-part test when the purpose of the ordinance would be violated by the requested variance. I will now apply this law to the case at hand.

¶ 41. One of Ziervogel and McGinnity's arguments is that the Board did not first decide the purpose of the ordinance before deciding to deny the variance and that the case must be reversed for this reason. A review of the record, however, reveals that they are wrong. The Board had before it the knowledge that the ordinance was a new one, effective June 1, 2001. The Board also knew that a vast majority of public response at the hearing and informational meetings supported preventing expansion of nonconforming structures within fifty feet of the ordinary high watermark. The Board therefore knew that the purpose of the ordinance was to prevent expansion of nonconforming structures within fifty feet of the shore. The obvious purpose was to limit nonconforming buildings that violate the buffer between the lake and its riparian owners.

¶ 42. Having determined the purpose of the ordinance, the Board then stacked up Ziervogel and McGinnity's proposal against the purpose of the ordinance. Ziervogel and McGinnity wanted to build a new story to their one-bedroom, raised ranch vacation home so that they could make it a year-around home. They

wanted to build two more bedrooms and an office. But the existing home is a mere twenty-six feet from the ordinary high watermark of Big Cedar Lake. It is a nonconforming use, built before the shoreland zoning ordinance took effect. The request thus came smack up against the purpose of the ordinance, which was to prevent expansion of nonconforming uses that already violated the fifty-foot buffer. Thus, the zoning authority shouldered Ziervogel and McGinnity with the burden of proving that, without the granting of the variance, they could have no reasonable use of the property.

¶ 43. Ziervogel and McGinnity appear to assert that if the Board did consider the purpose of the ordinance and did consider that their request violated the purpose of the ordinance, the Board was wrong. They argue that their proposed addition is not contrary to the purpose of the ordinance. They submit that if the purpose of the ordinance is to prohibit encroachments toward the lake, their request complies with that purpose because the addition would not further encroach one iota. The house would still be the same distance from the lake as before. No dirt would be upended. Thus, the ecological system would not be harmed. The view of the lake by the public would not be damaged because local foliage prevents it anyway. Moreover, the ordinance permits a thirty-five foot high structure and the proposed addition would be thirty-five feet high. Thus, the proposed addition does not violate the height portion of the ordinance. Therefore, because there would be no expansion toward the lake, no ecological upheaval, no height concerns and no aesthetic concerns, they posit that their request does not conflict with the purpose of the ordinance.

¶ 44. What we cannot forget, however, is that the house is nonconforming to begin with. The spirit of

zoning is to restrict a nonconforming use and eliminate such use as quickly as possible. *Waukesha County v. Seitz*, 140 Wis. 2d 111, 116, 409 N.W.2d 403 (Ct. App. 1987). Nonconforming uses are anomalies. They are suspect and therefore circumscribed. If the owner of the nonconforming use expands or enlarges the use, it should be the owner's burden to prove that the nonconforming use is still valid. *Waukesha County v. Pewaukee Marina, Inc.*, 187 Wis. 2d 18, 29, 522 N.W.2d 536 (Ct. App. 1994). Nonconforming uses are not to be enlarged *in derogation* of the general scheme. *Id.* at 24. It is quite obvious that Washington county's citizens, while having to tolerate nonconforming uses that violate shoreland setbacks, do not want to see expansion of those properties. The citizens have therefore voiced their support for circumscribing such expansions. Ziervogel and McGinnity say that the purpose is to prevent encroachment to the lake. That is not so. The purpose of the ordinance is to prevent any kind of expansion of riparian property that violates the setback requirements of the county's shoreland zoning ordinance. The house sits perilously close to the lake as it is. The idea is to prevent any improvement that would expand the use of the house. The request violates the purpose of the ordinance. Thus, for Ziervogel and McGinnity to prevail, they had to convince the Board that, without the variance, they could not reasonably use the property. That is the second part of the test. They lose here too. They can still make use of their home the way it is.

¶ 45. Having written about what I believe the law is in Wisconsin and how it applies to this case, I want to use the vehicle of a concurring opinion to make a couple of observations about what I perceive to be a misunderstanding about the law in this field.

342

¶ 46. First, a word about "use variances" and "area variances" and the accompanying differentiation between "unnecessary hardship" and "practical difficulty." The distinction between "area variances" and "use variances," and the imposition of separate requirements for the granting of each type, are inventions of the courts. 3 ANDERSON'S AMERICAN LAW OF ZONING § 20.06, at 424 (Kenneth H. Young ed., 4th ed. 1996). According to the Anderson treatise, the "no reasonable use" standard was used as early as 1927 by Judge Cardozo in *People ex rel. Fordham Manor Reformed Church v. Walsh,* 155 N.E. 575 (N.Y. 1927). 3 ANDERSON'S, *supra,* § 20.16, at 452–53. Other states simply followed the New York model. *Id.* at 453. It was also apparently the New York courts that developed a separate rule for "area variances." 3 ANDERSON'S, *supra,* § 20.48, at 579–80. Classification was apparently undertaken to permit the granting of variances regarded as trivial, without the establishment of the elements of unnecessary hardship. *See id.* at 580–81. Thus, area variances were seen as more easily obtained because all that need be shown is that the ordinance is wrought with "practical difficulty" to the property owner, while a use variance retained a much stricter standard of no reasonable use. *See* 3 ANDERSON'S, *supra,* § 20.49, at 582–83.

¶ 47. Second, it is evident from reading *Snyder* and *Kenosha County* that the court believed these distinctions to be unworkable, especially when it came to the shoreland zoning ordinance cases. The court obviously saw that while area variances were created by the courts to deal with "trivial" adjustments to the ordinance, requests for area variances concerning land coming within a shoreland zoning ordinance could hardly be said to be "trivial." Such matters as setback lines, frontage requirements, height limitations and lot

size restrictions are serious matters where our lakes, streams and rivers are concerned. These vital natural resources are not limitless and are not indestructible. Particularly as the ordinances relate to setbacks, Wisconsin has had a long history. As stated by The Wisconsin Association of Lakes, Inc., in its amicus curiae brief to the supreme court in *Kenosha County*:

> For more than 30 years, the 75 foot building setback standard has been widely accepted and generally adhered to by owners of rural riparian property. During that time, the shores of Wisconsin's 15,057 inland lakes have witnessed extensive development and redevelopment.
>
> Thousands of property owners have abided by the setback standards during these three decades and constructed beyond the established setback. The investments of these property owners would be jeopardized by lakeward expansion of existing buildings under the expansive standard for hardship under the Court of Appeals decision. More importantly, the interests of the public in establishing a buffer zone around public waters to protect their biologically vital near shore areas would be compromised.

Brief of Amici Curiae The Wisconsin Association of Lakes, Inc. at 2, *State v. Kenosha County Bd. of Adjustment*, 218 Wis. 2d 396, 577 N.W.2d 813 (1998) (No. 96–1235).

¶ 48. Thus, the new paradigm set forth in *Snyder*, and nicely explained by Justice Crooks in the *Outagamie County* concurrence, was designed—in my view—to delineate a difference between shoreland zoning ordinances and other zoning ordinances. By first divining the purpose, a zoning authority could then decide whether it was necessary to shoulder the land-

owner with the burden of proving that no reasonable use could be made of the property absent the granting of the variance.

¶ 49. We see that a requested variance in a shoreland zoning case, whether it is perfunctorily denominated by the landowner as an "area variance" or a "use variance," nevertheless can defeat the whole purpose of the ordinance if granted. Thus, employment of the strict "no reasonable use" standard is logically and environmentally correct where the shoreland zoning ordinance is concerned.

¶ 50. There appears to be a misconception on the part of some that *Kenosha County* departed from *Snyder* and announced a stringent "no reasonable use" standard for *every* kind of variance request. In other words, some believe that *Kenosha County* imposes this stringent test on even the most trivial of zoning requests and makes it all but impossible to ever obtain a variance and to ever allow local citizen boards to grant relief from a zoning ordinance. One need look no further than the lead opinion in *Outagamie County*, 2001 WI 78 at ¶¶ 41, 42, the majority opinion in this case, and the concurring opinion in the court of appeals decision, *State ex rel. Spinner v. Kenosha County Board of Adjustment*, 223 Wis. 2d 99, 588 N.W.2d 662 (Ct. App. 1998), to show that this misconception persists.

¶ 51. In truth, the requirement that the zoning board first look to the *purpose* of the ordinance belies the notion that boards have no authority to depart from the strict "no reasonable use" definition. If the purpose of the ordinance is not hampered and the requested variance is truly trivial, then of course the zoning boards retain the power to grant the request without

the landowner having to prove unnecessary hardship and, indeed, should do so under the law of *Snyder* and *Kenosha County*.

¶ 52. With the two-part test in place, where the "purpose" of the ordinance takes on paramount importance, I cannot understand the view that the law now requires the strict definition of unnecessary hardship—the "no reasonable use" definition—in every case. Thus, I see no need to go back to the formulistic "area variance/use variance" distinctions the New York courts fashioned in matters unrelated to shoreland zoning three-quarters of a century ago. To do so would be contrary to Wisconsin's storied history of upholding the public trust doctrine.

¶ 53. And Wisconsin's courts do have a long history regarding our waters. It dates from 1972 when our supreme court released *Just v. Marinette County*, 56 Wis. 2d 7, 201 N.W.2d 761 (1972). There, the court was faced with a challenge to a shoreland zoning ordinance, which required the landowner to get a permit before filling or grading in a wetland area. *Id.* at 11–14. The landowners were halted from their filling activities because they did not have a permit. *Id.* at 14. They brought an action contending that the shoreland zoning ordinance was a regulatory taking. *Id.*

¶ 54. The *Just* court asked: "Is the ownership of a parcel of land so absolute that man can change its nature to suit any of his purposes?" *Id.* at 17. The court answered the question by writing: "An owner of land has no absolute and unlimited right to change the essential natural character of his land so as to use it for a purpose for which it was unsuited in its natural state and which injures the rights of others." *Id.*

¶ 55. With this question and answer, our supreme court established itself at the center of a new way of

thinking about property rights where riparian property was concerned. No longer did humans have an inherent right to alter or develop environmentally sensitive land. The court in *Just* recognized that while judgments had been made solely on economic feasibility in the past, they now had to include an environmental incompatibility test. Further, environmental compatibility was determined to, at times, outweigh the economic interests of the landowner. The court stated that "[t]he changing of wetlands and swamps to the damage of the general public by upsetting the natural environment and the natural relationship is not a reasonable use of that land . . . ." *Id.* at 17–18.

¶ 56. I agree with James L. Karp in his comment, James L. Karp, *Aldo Leopold's Land Ethic: Is an Ecological Conscience Evolving in Land Development Law?* 19 ENVTL. L. 737, 751 (1989), that Leopold's ethic had developed some roots in *Just*. As Karp noted, *Just* rooted its decision in two bases now familiar to shoreline zoning cases: the public trust doctrine and a type of harm/benefit analysis. Karp, *supra,* at 751. As Karp explained: "Generally, this analysis holds that regulations trying to confer a public benefit must be justly compensated, but that regulations attempting to prevent public harm can be imposed without compensation." *Id.* The court in *Just* concluded that it was preventing harm to public rights by limiting the use of private property to its natural uses. Karp, *supra,* at 751.

¶ 57. In Karp's view, our supreme court was of the opinion that if environmental compatibility is recognized as a legitimate public interest, then prevention of environmental destruction will be an adequate basis for regulating. *Id.*

¶ 58. It is evident that, dating from the release of *Just*, our supreme court established itself at the fore-

front in the development of a land ethic where our shorelands were no longer treated solely as an economic commodity, but as a natural resource. It is my opinion that the vast majority of riparian landowners agree. Most are, as Leopold hoped, "ecologically minded [and] proud to be the custodian" of at least part of the land to support the public trust. A. LEOPOLD, A SAND COUNTY ALMANAC 249 (1966). This is reflected in the fact that the will of the citizenry has resulted in the passing of legislation designed to protect our shorelands from encroachment and runaway expansion. If Washington county can pass, with favorable support, an ordinance preventing nonconforming structures within fifty feet of the ordinary high watermark from expanding, that legislation shows a commitment to a land ethic.

¶ 59. Thus, most riparian owners understand that with the rights to riparian ownership comes the responsibility to help conserve the shoreland. I believe that the court in *Snyder* and *Kenosha County* merely built upon the cornerstone laid down in *Just*, the cornerstone being that the right to own riparian property brings with it a duty of restraint unless there can be "no reasonable use" of the property without granting a variance.